IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RONALD AU, | ) | CIVIL NO. 11-00251 JMS-KSC |
| | ) | |
| Plaintiff, | ) | ORDER (1) DENYING PLAINTIFF'S |
| | ) | RENEWED MOTIONS FOR |
| vs. | ) | PARTIAL SUMMARY JUDGMENT; |
| | ) | (2) GRANTING DEFENDANTS |
| REPUBLIC STATE MORTGAGE | ) | HOMEWARD RESIDENTIAL, INC. |
| COMPANY; CHAD COTTON; SAND | ) | AND WELLS FARGO BANK N.A.'S |
| CANYON CORPORATION, f.k.a. | ) | MOTION FOR SUMMARY |
| OPTION ONE MORTGAGE | ) | JUDGMENT; (3) DENYING |
| CORPORATION; HOMEWARD | ) | PLAINTIFF'S CROSS-MOTION FOR |
| RESIDENTIAL, INC., f.k.a. | ) | SUMMARY JUDGMENT AGAINST |
| AMERICAN HOME MORTGAGE | ) | DEFENDANT WELLS FARGO |
| SERVICING, INC.; and WELLS | ) | BANK N.A.; AND (4) DENYING |
| FARGO BANK, N.A., AS TRUSTEE | ) | REQUEST FOR RULE 54(B) |
| FOR OPTION ONE MORTGAGE | ) | CERTIFICATION |
| LOAN TRUST 2007-5 ASSET- | ) | |
| BACKED CERTIFICATES, SERIES | ) | |
| 2007-5, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER (1) DENYING PLAINTIFF'S RENEWED MOTIONS FOR
PARTIAL SUMMARY JUDGMENT; (2) GRANTING DEFENDANTS
HOMEWARD RESIDENTIAL, INC. AND WELLS FARGO BANK N.A.'S
MOTION FOR SUMMARY JUDGMENT; (3) DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT
WELLS FARGO BANK N.A.; AND (4) DENYING REQUEST FOR RULE
54(B) CERTIFICATION**

# I.  **INTRODUCTION**

This is the latest installment in this protracted litigation brought by pro se Plaintiff Ronald Au ("Plaintiff" or "Au")[1] arising out of a refinancing transaction on real property located at 45-030 Springer Place, Kaneohe, Hawaii (the "subject property").  Plaintiff has renewed two Motions for Partial Summary Judgment on remaining claims in the Fourth Amended Complaint ("Fourth AC") against Defendants Wells Fargo Bank N.A. ("Wells Fargo") and Homeward Residential, Inc. ("Homeward"), f.k.a. American Home Mortgage Servicing, Inc. ("AHMSI").[2]  *See* Doc. No. 240 (Second Renewal of Motions for Partial Summary Judgment, incorporating Doc. No. 175 as to Wells Fargo, and Doc. No. 181 as to Homeward).  Homeward and Wells Fargo ("Moving Defendants") have filed a corresponding Motion for Summary Judgment on all remaining claims against them, Doc. No. 245, and Plaintiff has filed a Counter-Motion for Partial Summary Judgment against Wells Fargo.  Doc. No. 282.

---

[1]  Plaintiff was a member of the Hawaii Bar from 1963 through 2005, when the Hawaii State Bar Association suspended his license to practice law.

[2]  AHMSI was Plaintiff's loan servicer during relevant periods, beginning on July 1, 2008.  *See* Doc. No. 155-1, Sugimoto Decl. ¶ 8; Doc. No. 246-13, Moving Defs.' Ex. 11.  Effective May 29, 2012, AHMSI changed its name to Homeward.  *See* Doc. No. 150, Notice of Name Change.  Many of the relevant documents in the record refer to AHMSI, but for the sake of consistency this Order hereafter refers to AHMSI as "Homeward" and substitutes "Homeward" for AHMSI as appropriate.  (The record reflects that, as of March 1, 2013, Homeward transferred servicing of Plaintiff's account to Ocwen Loan Servicing, LLC.  *See* Doc. No. 246-35, Moving Defs.' Exh. 33).

The court decides the Motions without an oral hearing under Local

Rule 7.2(d).  Based on the following, (1) Plaintiff's Renewed Motions for Partial

Summary Judgment (Doc. Nos. 175, 181, and 240) are DENIED; (2) Moving

Defendants' Motion for Summary Judgment (Doc. No. 245) is GRANTED; and

(3) Plaintiff's Cross-Motion for Summary Judgment (Doc. No. 282) against Wells

Fargo is DENIED.  The court, however, declines to certify judgment against Wells

Fargo and Homeward as final under Federal Rule of Civil Procedure 54(b).

## II.  **BACKGROUND**

The court has issued multiple Orders over the past two years as to

various Defendants, and as to different aspects and versions of Plaintiff's

Complaints.  Among them are the following dispositive Orders, which the court

refers to in this Order:

- *Au v. Republic State Mortg. Co.*, 2011 WL 3422780 (D. Haw. Aug. 4, 2011) (granting in part Defendant Republic State Mortgage Co.'s ("Republic")  Motion to Dismiss First Amended Complaint) ("*Au I*");

- *Au v. Republic State Mortg. Co.*, 2012 WL 760316 (D. Haw. Mar. 8, 2012) (granting Homeward's Motion to Dismiss Counts Three and Five of the Third Amended Complaint) ("*Au II*");

- *Au v. Republic State Mortg. Co.*, 2012 WL 3113147 (D. Haw. July 31, 2012) (granting in part Motions to Dismiss the Fourth Amended Complaint) ("*Au III*");

- *Au v. Republic State Mortg. Co.*, 2012 WL 6726384 (D. Haw. Dec. 27, 2012) (denying Plaintiff's Motion to File Fifth Amended

Complaint) ("*Au IV*"); and

- *Au v. Republic State Mortg. Co.*, 2013 WL 1339738 (D. Haw. Mar. 29, 2013) (granting in part and denying in part Republic's Motion for Summary Judgment) ("*Au V*").

The parties are thus more than familiar with the factual background and confusing procedural history of this case. And because the present Motions concern only Plaintiff's remaining claims against Wells Fargo and Homeward, the court reiterates only the facts necessary to resolve specific claims against those Defendants.[3] Where appropriate, the court refers to the evidentiary record, construed in the light most favorable to the non-moving party as required at this summary-judgment phase. *See, e.g.*, *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009) ("All justifiable inferences must be drawn in [Plaintiff's] favor, and [the court] must deny summary judgment if any rational trier of fact could resolve an issue in his favor.") (citation omitted). To understand the current posture, however, it's important to understand what happened previously. In particular, *Au*

---

[3] Plaintiff's twice-renewed "Motion for Partial Summary Judgment as to Defendant Option One Mortgage Corporation, Now Known as Sand Canyon Corporation, and Defendant Wells Fargo Bank N.A.," Doc. No. 175, only applies to the remaining claims against Wells Fargo (although it originally sought relief against both Wells Fargo and Defendant Sand Canyon Corporation ("Sand Canyon")). As detailed below, the court has dismissed all claims against Sand Canyon and denied further leave to amend. And in allowing a prior renewal of the Motion, the court specifically renewed it only as to Wells Fargo. *See* Doc. No. 217 (court minute order stating that "Plaintiff's Motion for Partial Summary Judgment as to Option One/Sand Canyon, Doc. No. 175, is renewed **only** as to Wells Fargo (Option One/Sand Canyon is no longer a Defendant in this action)"). To the extent the Motion remains pending against Sand Canyon administratively, the Motion is DENIED as moot as to Sand Canyon.

4

*III* directly addressed some of Plaintiff's claims in the Fourth AC against Wells Fargo and Homeward, and *Au V*'s subsequent rulings on claims against Republic are, in turn, dispositive of some of the remaining claims against Wells Fargo. Thus, in setting forth the relevant facts, the court also refers to the relevant conclusions from prior decisions to put this Order into proper context.

## A.      Relevant Factual Background

The action arises from Plaintiff's February 2, 2007 refinancing transaction on the subject property.  During the transaction, Plaintiff dealt with Defendant Chad Cotton ("Cotton"), who was, or represented himself to be, associated with Republic.  Doc. No. 128, Fourth AC ¶ 3.  Cotton allegedly told Plaintiff that Republic could refinance the subject property for $680,000 at a rate of 7.5% per annum as long as the loan closed by the first week of February 2007. *Id.* ¶ 9.  At closing on February 2, 2007, however, Plaintiff was presented with loan documents indicating an adjustable rate loan, with an initial rate of 8.925% for $700,000 (which included closing costs of over $19,000). *Au V*, 2013 WL 1339738, at *2.

Plaintiff questioned the figures at closing, and called or attempted to call Cotton.  Cotton or another Republic representative told Plaintiff by telephone that (1) Republic had "misunderstood" that there was a loan commitment for 7.5%;

and (2) after closing, Republic would "adjust" or modify the mortgage and promissory note to reflect the correct interest rate, and rebate certain closing costs. *Id.* Allegedly relying on these representations, Plaintiff proceeded to close escrow. Plaintiff knowingly and admittedly signed various closing documents clearly listing the terms of an adjustable rate loan amount of $700,000 at 8.925%. *See, e.g.*, Doc. No. 246-6, Moving Defs.' Ex. 4; *Au V*, 2013 WL 1339738, at *2.

According to one of Plaintiff's theories, Republic or Cotton[4] (or both) were not licensed mortgage brokers or solicitors in Hawaii, and therefore the note and mortgage entered into on February 2, 2007 are void and unenforceable under a then-applicable statutory provision, Hawaii Revised Statutes ("HRS") § 454-8.[5] *Id.*; *see Au I*, 2011 WL 3422780, at *6 ("Plaintiff had a matured right to bring a cause of action for violation of HRS Ch. 454 [in 2007]").[6] Plaintiff's suit thus seeks rescission of the transaction on that and other bases.

---

[4] Although Plaintiff has obtained entry of default against Cotton, Doc. No. 265, he has not obtained default judgment and Magistrate Judge Kevin Chang has "caution[ed] that there may be a question about whether Plaintiff properly served Defendant Cotton." Doc. No. 267.

[5] *Au I* determined that HRS § 454-8, which was repealed effective January 2, 2011, can apply to the refinancing transaction at issue in this action, which took place in 2007. *See Au I*, 2011 WL 3422780, at *6 ("Plaintiff had a matured right to bring a cause of action for violation of HRS Ch. 454 [in 2007]"). That is, the repeal was not retroactive.

[6] Although the statute potentially applied, *Au V* recently rejected the theory of rescission, determining as a matter of law that Republic was exempt from provisions of the prior HRS Ch. 454. *See Au V*, 2013 WL 1339738, at *8-9.

On February 8, 2007, Republic assigned the note and mortgage to Sand Canyon (known at that time as Option One Mortgage Corporation ("Option One").[7]  *Au V*, 2013 WL 1339738, at *2.  Subsequently, Sand Canyon assigned the loan (the note) to Wells Fargo on April 1, 2007 as part of a loan securitization Pooling and Service Agreement ("PSA").  *Id.*  The mortgage was assigned to Wells Fargo on January 4, 2012 (after this action was filed), and that assignment was recorded in the Hawaii Bureau of Conveyances on January 12, 2012.  *Id.*[8]

Plaintiff's loan was initially serviced by Sand Canyon.  *Au III*, 2012 WL 3113147, at *2.  As noted above, the undisputed record establishes that Sand Canyon later sold its mortgage servicing business to Homeward, effective on April 30, 2008.  Doc. No. 155-1, Sugimoto Decl. ¶ 8.  Homeward began servicing Plaintiff's loan effective on July 1, 2008.  Doc. No. 246-13, Moving Defs.' Ex. 11.  The record confirms that Plaintiff was notified in writing, by letter of June 16, 2008, of this change in loan servicers.  *Id.*

---

[7]  As noted above, the court has dismissed all claims against Sand Canyon, and denied Plaintiff's request seeking leave to file a Fifth Amended Complaint attempting to state claims against Sand Canyon.  *See Au IV*, 2012 WL 6726384, at *3-5.

[8]  Sand Canyon states that the "loan" was assigned to Wells Fargo on April 1, 2007, and that the assignment was recorded on January 12, 2012 (although that assignment appears to apply only to the mortgage and not the note).  *See, e.g.*, Doc. No. 276, Sand Canyon Opp'n at 5.  Ultimately, however, if there is a discrepancy, it is immaterial here because, as analyzed below in Section IV.A.2, Plaintiff has no standing to challenge any supposed defect in the violation of the PSA and/or resulting assignment.

At times in 2009, Plaintiff apparently experienced some difficulty making timely loan payments and was often assessed for late charges.  *See* Doc. No. 246-14, Moving Defs.' Ex. 12 at 6; Doc. No. 246-15, Moving Defs.' Ex. 13; Doc. No. 283-15, Pl.'s Ex. 14 at 7.  On February 6, 2009, Plaintiff wrote a letter to Republic and Homeward stating that "I believe that I am entitled to a loan modification in the interest rate and principal that you are assessing monthly."  *Au V*, 2013 WL 1339738, at *2.  Plaintiff wrote, in part:

> On closing [on February 2, 2007], I first learned that the settlement charges were over $19,000, and the loan was at 8.9%.  This was not what was represented by the representative of Republic State Mortgage.  I immediately called him before signing any documentation.  I was not able to reach him at his number, which I believe to be Texas.  I spoke to a representative of the company where Mr. Cotton is employed, and they advised me that they owned or worked very closely with Republic State Mortgage and that the difference in settlement charges would be rebated to me after closing.  I was further advised that because of their close connection to Republic State Mortgage, that the interest rate would be adjusted and I would receive documents for modification.
> . . . .
> I believe that there has been misrepresentation and fraud by the representative of Republic State Mortgage in soliciting the refinancing through Republic State Mortgage.
> . . . .
> I have been making good faith payments pursuant to the loan statement by the loan servicing company, in good faith so as not to jeopardize my mortgage.  Pursuant to

> the Federal law, I am demanding a loan modification as
> to the interest rate and to the excessive settlement charges
> that were assessed without prior notice.

*Id.* at *2-3.

Plaintiff subsequently had numerous other similar telephone and email communications with Republic regarding the loan.  *Id.* at *3.  He also wrote numerous letters to Republic and Homeward, leading to the allegations against Homeward in this action of violations of 12 U.S.C. § 2601 *et seq.*, the Real Estate Settlement Procedures Act ("RESPA"), HRS Ch. 454M, HRS Ch. 480 (among other claims).  In particular, as relevant to the current Motions, the Fourth AC alleges in part that:

> Defendant [Homeward], as the servicer[,] has violated
> HRS [§] 454-3.1(1) and 12 USCS Section 2605 e (1),(2)
> [sic. 2605(e)(1), (2)] (RESPA), and HRS 454 [§] M-6.1
> [sic. 6(1)] (effective July 1, 2010), by Defendant
> [Homeward]'s failure to provide information and
> clarification within 20 days, and Defendant
> [Homeward]'s failure to provide credits, reimbursements,
> or refunds and adjustments, within 60 days.  Plaintiff Au
> attempted to obtain information on his account through a
> toll-free company in the country of India . . . .  Plaintiff
> Au was not provided a direct telephone contact with the
> Defendant [Homeward] in the United States, and was
> required to attempt to obtain by written request
> information from Defendant [Homeward] in the United
> States; and Plaintiff Au resorted to correspondence with
> the servicing agent in Texas[.]

Doc. No. 128, Fourth AC ¶ 72.  It further alleges:

9

> On November 29, 2010, Plaintiff Au communicated with Defendant [Homeward] as the loan servicer to provide an itemization of Plaintiff Au's escrow account . . . .  <u>Au received no response</u> from Defendant [Homeward] and repeated his request in writing on December 14, 2010, and on March 17, 2011, and on March 29, 2011, after Au continued to receive letters from Defendant [Homeward] of delinquency and threatening foreclosure against Au.

*Id.* ¶ 72A.  And it makes other similar allegations that Homeward failed to respond to Au's letters.  For example:

> On April 5, 2011, Au requested Defendant [Homeward] as to the brief analysis of the escrow account, inquiring why Au had been assessed charges for the county real property tax of $8,878.20, which Au had earlier paid, and Au inquired after Defendant [Homeward] received proof that Au paid the County taxes on June 29, 2009[.] . . . Defendant [Homeward] has never provided a response or an explanation on Au's inquiries[.]
> . . . .
> Au had previously made wire transfers from his checking account to Defendant [Homeward] . . . .  Plaintiff wrote to Defendant [Homeward] on January 24, 2011, and on March 1, 2011, to provide an explanation or details and <u>Defendant [Homeward] has never responded</u>.
> . . . .
> On April 25, 2011, Plaintiff . . . wrote to Defendant [Homeward] that according to Plaintiff's calculation Plaintiff had overpaid or had been overcharged $35,714.00, and . . . <u>Defendant [Homeward] has never responded</u>.

*Id.* ¶¶ 72B-D.

> In all, Plaintiff's Motion against Homeward, and his Opposition to

Wells Fargo and Homeward's Motion, together reference at least twenty five

letters from Plaintiff to Republic and/or Homeward in the 2009 to 2011 period

(although not all are plead in the operative Complaint, and some post-date the

initiation of this action) regarding issues related to his loan (and a like number of

letters from Homeward to Plaintiff).  *See* Doc. No. 182-1, Pl.'s CSF; Doc. No. 246,

Moving Defs.' CSF; Doc. No. 283, Pl.'s CSF in Opp'n.  These letters -- and the

relevant history of Homeward's servicing of Plaintiff's loan from 2008 to 2011 --

are detailed separately in Section IV.B.1.c. below when analyzing Plaintiff's

RESPA claims against Homeward.  In this regard, the record indicates that Plaintiff

last made a mortgage payment for January 2011.  *See* Doc. No. 246-14, Moving

Defs.' Ex. 12 at 12.

**B.    Procedural Background and Relevant Prior Rulings**

This action was originally filed in state court on March 15, 2011.

Doc. No. 246-36, Moving Defs.' Ex. 34.  Plaintiff's First Amended Complaint,

filed in state court on March 24, 2011, was then removed to this court on April 14,

2011.  Doc. No. 1, Notice of Removal at 1.  After substantial motions activity and

two further amendments, Plaintiff filed the Fourth AC on April 16, 2012.  Doc. No.

128.  The thirty-nine page Fourth AC alleges the following twelve Counts against

Republic, Cotton, Sand Canyon, Homeward, and Wells Fargo:

- Count One - "Breach of Contract"
- Count Two - "Breach of Promissory Estoppel"
- Count Three - "Intentional or Negligent Misrepresentation"
- Count Four - "Violation of Hawaii Revised Statutes Chapter 454"
- Count Five - "Violations of Federal Truth in Lending Act 15 USC 1601-1667, et seq., 12 C.F.R. Section 226.23"
- Count Six - "Violation of Hawaii Revised Statutes 454-4 and Hawaii Revised Statutes 454F-17 (Amended Effective July 1, 2010)"
- Count Seven - "Fraud, Nondisclosure and Concealment"
- Count Eight - "Violation of HRS Chapter 490:1-203 Uniform Commercial Code, Good Faith and Fair Dealing"
- Count Nine - "Violation of Hawaii Revised Statutes 454D, 454D-6, 454-3(1), 454M, 454M-6 (Effective July 1, 2010[)], and 12 USCS Section 2605 et seq., RESPA, 24 CFR 3500 et seq."
- Count Ten - "Violation of Hawaii Revised Statutes Chapters 480 and 480-12"
- Count Eleven - "Violation of 15 USCA Section 1692(a)(6)[,] the Fair Debt Collection Practices Act"
- Count Twelve - "Holder in Due Course, Hawaii Revised Statutes Section 490:3-302 et seq."

*Id.*

### 1.     **Au III -- *The Court's July 31, 2012 Order***

On July 31, 2012, the court granted in part and denied in part various

motions to dismiss, defining and limiting the scope of the Fourth AC.  Doc. No.

173, *Au III*, 2012 WL 313147.  As relevant here, the court dismissed Counts Three,

Six, Seven, Eight, and Twelve as to Homeward (and Counts One, Two, Four, Five

and Eleven were not asserted against Homeward).  *Id.* at *18.[9]  The court ruled,

however, that Counts Nine (in part) and Ten (in part) survived Homeward's

Motion to Dismiss.  That is, assuming the Fourth AC's most basic factual

allegations as true, the court determined that Count Nine's claims for violations of

RESPA, and related violations of HRS Ch. 454M-6, could proceed.  *Id.* at *6.  The

court, however, dismissed Count Nine insofar as it alleged violations of the

repealed HRS Ch. 454.  *Id.*

As to Count Ten against Homeward, asserting a violation of HRS

§ 480-2, the court determined that

> [T]he scope of the Fourth AC's allegations against
> [Homeward] could encompass conduct -- beyond that
> necessarily preempted by federal law -- which might
> otherwise constitute unfair or deceptive trade practices
> under chapter 480. . . .   For example, the Fourth AC
> alleges that [Homeward] "fail[ed] to provide escrow and
> accounting information . . . overcharg[ed] for fire,
> hazard, hurricane insurance premiums, . . . assess[ed]
> delinquent charges, fail[ed] to promptly credit Plaintiff
> Au upon receipt of monthly payments, . . . [and] fail[ed]
> to provide an annual detailed and complete escrow
> account statement."  Doc. No. 128, Fourth AC ¶ 80.
> Count Ten alleges enough to state a § 480-2 claim against
> [Homeward].

---

[9]  *Au III* dismissed all remaining claims against Sand Canyon, with leave to amend as to certain counts.  2012 WL 3113147, at *18-19.  It also dismissed some claims against Republic, leaving others (which were not moved on) for determination later.  *Id.* at *18.  *Au IV* later denied Plaintiff further leave to amend.  2012 WL 6726384, at *5.

*Au III*, 2012 WL 3113147, at *8.

As to Wells Fargo, *Au III* dismissed Counts Three, Six, Eight, Ten (in part), Eleven, and Twelve. *Id.* at *19. (Counts One, Two, and Nine were not asserted against Wells Fargo; and Wells Fargo did not move as to Counts Four, Five, and Seven.) Three of the counts -- Counts Four, Five, and Ten (in part) -- sought rescission of the loan transaction: (1) Count Four alleged a claim against Republic for violating HRS Ch. 454 -- and, under the prior HRS § 454-8, "[a]ny contract entered into by any person with any unlicensed mortgage broker or solicitor shall be void and unenforceable;" (2) Count Five asserted violations of the Truth in Lending Act ("TILA") against Republic, Cotton, and Sand Canyon -- and, under certain circumstances, TILA allows a claim for rescission (although the court had determined that Plaintiff's TILA-based rescission claim was time-barred); and (3) Count Ten had, among other claims, sought rescission under HRS § 480-12, which provides that "[a]ny contract or agreement in violation of this chapter is void and is not enforceable at law or in equity." Thus, given the possibility -- at the time -- that rescission of the loan transaction might be a viable remedy, Wells Fargo (as the current holder of the note and mortgage) was a required party to the litigation. *See Au II*, 2012 WL 760316, at *1 ("[I]t would not be possible to void the note and/or mortgage without the presence of Wells Fargo . . . . That is, Wells

14

Fargo should be added as a required party under Federal Rule of Civil Procedure 19.").

To summarize, after *Au III*, the only counts remaining against Homeward are Counts Nine (RESPA & parts of HRS Ch. 454M) and Ten (HRS Ch. 480). The only counts remaining against Wells Fargo are Counts Four (the former HRS Ch. 454), Five (TILA), Seven (Fraud), and Ten (HRS Ch. 480) -- and, as to Wells Fargo, Counts Four, Five, and Ten primarily were still viable because Wells Fargo is a required party to claims seeking rescission of the loan transaction. These are the counts at issue in the present Motions and addressed in this Order.

> **2.    Au V -- *The Court's March 29, 2013 Order***

Before ruling on the present Motions, however, it is also important to reiterate the primary conclusions from *Au V* -- the court's subsequent March 29, 2013 Order, which granted in part and denied in part Republic's Motion for Summary Judgment (and denied Plaintiff's Motion for Partial Summary Judgment against Republic).[10]  *See Au V*, 2013 WL 1339738, at *1.  This is because *Au V* made dispositive rulings that ultimately also control most of the remaining claims against Wells Fargo.

In particular, *Au V* granted summary judgment in favor of Republic on

---

[10]  The present Motions were filed before *Au V* was decided.

Counts Four, Five and Ten -- all of the statutory claims seeking rescission of the subject loan.  As to Count Four, *Au V* concluded that it was undisputed that Republic was a "foreign lender" as defined in HRS § 207-11(c), such that it was exempt from the provisions of the former HRS Ch. 454 -- and thus Plaintiff's claim against Republic seeking to void the loan under HRS § 454-8 necessarily failed. 2013 WL 1339738, at *9-10.  As to Count Five, *Au V* reiterated that any TILA-based rescission claim is time-barred and not subject to equitable tolling under TILA's absolute three-year statute of repose.  *Id.* at *11 (citing *McOmie-Gray v. Bank of Am. Home Loans*, 667 F.3d 1325, 1329-30 (9th Cir. 2012)).  And, as to Count Ten, *Au V* granted summary judgment against Plaintiff on his claims for violations of HRS § 480-2 against Republic -- and thus he necessarily cannot obtain rescission under HRS § 480-12.  *Id.* at *12-13.  Further, because Plaintiff had provided no evidence indicating an ability to tender the loan proceeds and unwind the transaction, the court concluded that rescission was not possible in any event.  *See id.* at *13 ("[E]ven if there were a question as to whether a § 480-12 claim otherwise survives, Plaintiff has not established that he is entitled to rescission as a matter of law.").[11]

---

[11] *Au V*, however, allowed Plaintiff's claims for breach of contract, promissory estoppel, and misrepresentation to remain -- questions of fact preclude entry of judgment in Republic's favor as it is plausible, construing all evidence in Plaintiff's favor, for oral promises of Cotton

(continued...)

C.     **The Motions at Issue**

1.     ***Plaintiff's Motions for Partial Summary Judgment***

On February 26, 2013, Plaintiff filed his "Second Motion for Renewal

of Motion[s] for Partial Summary Judgment," Doc. No. 240, which renewed for a

second time two underlying Motions: (1) Plaintiff's Motion for Partial Summary

Judgment as to Wells Fargo, Doc. No. 175; and (2) Plaintiff's Motion for Partial

Summary Judgment as to Homeward, Doc. No. 181.  These two underlying

Motions are now before the court (in part), although some explanation is necessary

to understand the issues and claims that the court needs to decide.

Plaintiff had filed the two underlying Motions for Partial Summary

Judgment in August 2012, shortly after he filed the Fourth AC.  The court denied

them without prejudice because Plaintiff had, in the interim, filed a Motion seeking

leave to amend to file a Fifth Amended Complaint.  Doc. No. 186.  The court

indicated that Plaintiff could re-notice the underlying Motions, if appropriate, after

the court resolved Plaintiff's Motion seeking leave to amend.  *Id.*  After the court

denied further leave to amend (*see Au IV*, 2012 WL 6726384, at *5), Plaintiff filed

---

[11](...continued)
(on behalf of Republic) to have been given in circumstances to avoid Hawaii's statute of frauds
and allow application of a promissory estoppel theory.  *See Au V*, 2013 WL 1339738, at *4-7.
Those Counts, however, did not name Wells Fargo -- a bona fide purchaser -- as a Defendant,
and Plaintiff has not argued that Wells Fargo's presence is necessary as to Counts One or Two as
to Republic.

a "Motion for Renewal of Motion[s] for Partial Summary Judgment," Doc. No.

216, seeking to re-notice the underlying Motions, as he had been allowed to do.

The court granted the Motion for Renewal *in part*, issuing a minute order

providing:

> The court GRANTS IN PART Plaintiff's Motion for
> Renewal of Motions.  Doc. No. 216.  Plaintiff's Motion
> for Partial Summary Judgment as to American Home
> Mortgage Servicing, Inc. (now known as Homeward
> Residential, Inc.), Doc. No. 181, is renewed and deemed
> filed as of January 9, 2013.  But Plaintiff's Motion for
> Partial Summary Judgment as to Option One/Sand
> Canyon and Wells Fargo, Doc. No. 175, is renewed only
> as to Wells Fargo (Option One/Sand Canyon is no longer
> a Defendant in this action), and is also deemed filed as of
> January 9, 2013.

Doc. No. 217, Minutes of January 9, 2013.  Thereafter, upon a joint request, the

underlying Motions were deemed withdrawn without prejudice, while the parties

engaged in settlement discussions.  Doc. No. 227.  After those settlement

discussions failed, the underlying Motions were renewed for a second time, as

sought in Plaintiff's February 26, 2013 "Second Motion for Renewal of Motion for

Partial Summary Judgment."  Doc. No. 240.  Although the court did not repeat that

this second renewal of Plaintiff's Motion at Doc. No. 175 was only as to Wells

Fargo, the record plainly indicates that this Motion cannot apply to Sand Canyon

(which has been dismissed and is no longer a party to this action) and thus the

Motion here is limited to any remaining claims against Wells Fargo only.

Oppositions to Plaintiff's Motion as to Wells Fargo, Doc. No. 175, were filed on April 8, 2013. *See* Doc. No. 272, Opp'n of Wells Fargo; and Doc. No. 276, Opp'n of Sand Canyon. An Opposition to Plaintiff's Motion as to Homeward, Doc. No. 181, was also filed on April 8, 2013. *See* Doc. No. 274, Opp'n of Homeward. Plaintiff filed a combined Reply on April 16, 2013. Doc. No. 289.

### 2. *Moving Defendants' Motion for Summary Judgment, and Plaintiff's Counter-Motion for Summary Judgment Against Wells Fargo*

On March 6, 2013, Moving Defendants filed their Motion for Summary Judgment on all Remaining Claims. Doc. No. 245. Plaintiff filed his Opposition on April 9, 2013. Doc. No. 281. Moving Defendants filed their Reply on April 15, 2013. Doc. No. 287.

In conjunction with his Opposition, on April 9, 2013, Plaintiff also filed a separate "Cross-Motion for Summary Judgment against Defendant Wells Fargo Bank, N.A.," Doc. No. 282, which the court construes as a related counter-motion under Local Rule 7.9. Wells Fargo filed an Opposition to this counter-motion on April 15, 2013. Doc. No. 286.

# III. __STANDARD OF REVIEW__

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of*

*Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's*

*Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has

carried its burden under Rule 56[(a)] its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts [and] come forward

with specific facts showing that there is a *genuine issue for trial*."  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal

quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## IV. DISCUSSION

### A. Plaintiff's Remaining Claims Against Wells Fargo Fail

First, Moving Defendants seek summary judgment on all claims remaining against Wells Fargo after *Au III* narrowed the scope of the Fourth AC. Specifically, they move for summary judgment as to Counts Four (the former HRS Ch. 454), Five (TILA), Seven (Fraud), and Ten (HRS Ch. 480) against Wells Fargo.

**1.      *Counts Four, Five, and Ten Seeking Rescission Fail as to Wells Fargo***

As described above, after Moving Defendants filed their Motion for

Summary Judgment, *Au V* granted summary judgment as to Republic on Counts

Four, Five, and Ten.  Thus, it is no longer possible for Plaintiff to obtain rescission

on these Counts.  It follows that -- because Wells Fargo, as the current holder of

the loan, only remains as a Defendant on those Counts for purposes of possible

rescission of the loan transaction -- these Counts now necessarily fail as to Wells

Fargo.  That is, because Plaintiff may not rescind the loan transaction under

theories pled in Counts Four, Five, or Ten, Wells Fargo's presence is superfluous.

Accordingly, Moving Defendants' Motion for Summary Judgment, Doc. No. 245,

is thus GRANTED as to those Counts against Wells Fargo (and, to the extent

Plaintiff sought summary judgment in his favor on those Counts, Plaintiff's

Motion, Doc. No. 175, is DENIED).

**2.      *Count Seven (Fraud) Fails***

The final remaining Count against Wells Fargo is Count Seven

alleging fraud.  In relevant part, Count Seven alleges:

> 61.  The fraudulent practice of [Sand Canyon] and [Wells Fargo] was to not have the mortgage assigned until January 4, 2012, which was recorded in the State of Hawaii Bureau of Conveyances as Document No. A-43940907, was a prohibited practice pursuant to HRS

22

454 F-17.

> 62.  As a direct result of the fraudulent mortgage practice of [Republic, Cotton, and Sand Canyon], Plaintiff Ronald Au has sustained special and general damages, and requests this Court to strike the mortgage and promissory note as void and unenforceable, pursuant to HRS 454-8, and that the court determine that [Wells Fargo] and [Homeward] have no standing to commence any foreclosure action on the Springer Place property and against Plaintiff Au.

Doc. No. 128, Fourth AC ¶¶ 61-62.  Plaintiff appears to argue that the assignment of the note and mortgage was invalid -- either because a PSA was used (resulting in the non-disclosure of the assignment) or because the assignment violated the terms of the PSA -- and thus Wells Fargo "should be dismissed. . . . [and] the recorded assignment . . . should be expunged from the State of Hawaii Bureau of Conveyances as void and unenforceable."  Doc. No. 175, Pl.'s Mot. at 3; Doc. No. 289, Pl.'s Reply at 3.  Either way, however, the claim fails based on established authority (and, indeed, authority that the court has already applied in this case).

First, as noted in *Au III*,

> [T]o the extent the Fourth AC attempts to assert a violation of the Sand Canyon/Wells Fargo [PSA], it is established that Plaintiff -- as neither a party to, nor a beneficiary of, the PSA -- lacks standing to challenge such alleged violations.  *See, e.g.*, *Velasco v. Security Nat'l Mortg. Co.*, 823 F. Supp. 2d 1061, 1067 (D. Haw. 2011) (rejecting "slander of title" claim challenging assignment of the note and mortgage because where the

23

> borrower is not a party or intended beneficiary of the assignment, he cannot dispute the validity of the assignment); *Abubo v. Bank of N.Y. Mellon*, 2011 WL 6011787, at *8 (D. Haw. Nov. 30, 2011) (rejecting claim asserting violation of a PSA because a third party lacks standing to raise a violation of a PSA); *Williams v. Rickard*, 2011 WL 2116995, at *5 (D. Haw. May 25, 2011) (explaining the difference between a borrower's and lender's standing to raise affirmative claims in this context).

2012 WL 3113147, at *4 n.6. *Abubo* rejected a claim for fraud based on an

allegedly invalid assignment, reasoning as follows:

> Plaintiffs fail to state a claim for fraud based on an allegation that the assignment is invalid as being made to a "closed" securitization trust in violation of the PSA. This argument has been rejected in recent decisions by many courts -- which this court finds persuasive -- either (1) because a third party lacks standing to raise a violation of a PSA, or (2) because noncompliance with terms of a PSA is irrelevant to the validity of the assignment (or both).

2011 WL 6011787, at *8 (citing numerous cases).

Likewise, *Au III* rejected Plaintiff's claim in Count Ten (HRS § 480-

2) against Wells Fargo (nearly identical to his remaining claim in Count Seven), as

follows:

> Plaintiff has not explained how Wells Fargo could have committed an unfair or deceptive act [under HRS § 480-2] simply by failing to disclose that it was assigned the Note as part of a PSA in April 2007, or by only having been assigned the Mortgage in January of 2012. Properly

24

executed, the use of pooling agreements in the loan securitization process is not inherently unfair or deceptive.  *See, e.g.*, *Menashe*, [*v. Bank of New York*, 850 F. Supp. 2d 1120, 1142-43 (D. Haw. 2012)] (citing numerous cases rejecting that securitization of mortgage loan provides mortgagor a cause of action); *Rodenhurst v. Bank of Am.*, 773 F. Supp. 2d 886, 898 (D. Haw. 2011) (same).

2012 WL 3113147, at *11.  By the same logic, Wells Fargo is now entitled to summary judgment on Count Seven's theory of fraud.  Even if the assignments via a PSA were not disclosed or recorded earlier, there is nothing in the record to indicate fraud.  *See, e.g.*, *Menashe*, 850 F. Supp. 2d at 1142-43.

Moreover, construed liberally in favor of Plaintiff, Count Seven pleads fraud in the inducement, not fraud in the factum.  Accordingly, at most the loan would be voidable (not void) under Count Seven's theory -- and thus rescission as to Wells Fargo, which was not involved in the loan origination, is not possible.  *See, e.g.*, *Beazie v. Amerifund Fin., Inc.*, 2011 WL 2457725, at *10 (D. Haw. June 16, 2011) ("To establish that the loan transaction is void as to Moving Defendants -- who were not a party to the loan transaction -- Plaintiff must establish that the transaction is void, and not merely voidable. . . .  To establish that the mortgage transaction is void for fraud -- and can be cancelled against a bona fide purchaser . . . -- Plaintiff must establish fraud in the factum, as opposed to fraud in the inducement.") (citations omitted).  Plaintiff admits that he knew he

25

was entering into the loan transaction.  Nothing indicates Plaintiff signed a note believing it was some other document, or that he lacked capacity to enter into the transaction.  *See id.*; *compare Young v. Bank of N.Y. Mellon*, 848 F. Supp. 2d 1182, 1193 (D. Haw. 2012) (allowing a rescission claim under HRS § 480-12 where a question remained whether a consumer lacked the capacity to enter into the mortgage contract).

  *Au V* also concluded, when dismissing Plaintiff's claim for rescission under HRS § 480-12, that Plaintiff had not provided evidence of an ability to tender the loan proceeds so as to unwind the loan transaction.  2013 WL 1339738, at *13.  And on April 16, 2013, the court denied Plaintiff's Motion for Reconsideration of *Au V*, Doc. No. 288, despite Plaintiff's belated and insufficient statement that he "believes following a rescission order that he is financially capable of paying the balance of $400,000.00 within a minimum of 30 days and a maximum of 60 days."  Doc. No 284-2, Au Decl. ¶ 2.  Likewise, Plaintiff's statement in opposing the Motion for Summary Judgment here as to Count Seven that "Au is financially capable of paying the $400,000.00 after an order of rescission with a minimum of 30 days and a maximum of 60 days," Doc. No. 283-1, Au Decl. ¶ 2, does not establish that he can unwind the loan transaction under a fraud theory.

It is insufficient because the amount financed minus origination charges was approximately $682,000 (Doc. No. 246, Moving Defs.' Ex. 4), and so the tender amount would be approximately $599,000 (subtracting the payments already made of approximately $83,000, Doc. No. 246, Moving Defs.' Ex. 13 at 11). Thus, even considering Plaintiff's vague statement that he believes he could tender $400,000, he has not established any ability to unwind the loan transaction as necessary for any rescission claim. *Cf. Williams v. Rickard*, 2011 WL 2116995, at *7 (D. Haw. May 25, 2011) (finding declaration proposing loan modification insufficient substitute for unwinding loan transaction for purposes of rescission claim).

In sum, for several reasons, as to Count Seven alleging fraud, Plaintiff's Motion for Partial Summary Judgment as to Wells Fargo, Doc. No. 175, is DENIED. Moving Defendants' corresponding Motion for Summary Judgment, Doc. No. 245, as to Count Seven is GRANTED.

**B.    The Remaining Claims Against Homeward -- Violations of RESPA, HRS Ch. 454M, and HRS Ch. 480 -- All Fail**

Next, Moving Defendants seek summary judgment against Homeward on Counts Nine and Ten, which -- after *Au III* -- are limited to (1) allegations of violations of RESPA, and a related state-law claim for violations of HRS Ch. 454M; and (2) violations of HRS § 480-2. The court addresses each Count in turn.

27

### 1. Count Nine (RESPA)

Plaintiff argues three theories under RESPA.  First, he contends he was not provided with notice that the servicer of his loan had changed from Sand Canyon to Homeward, in violation of 12 U.S.C. § 2605(b).  Doc. No. 181-1, Pl.'s Mot. at 1, 4, 7.  He also contends that Homeward failed to provide him an annual escrow statement as required under 12 U.S.C. § 2609(c) and 24 C.F.R. § 3500.17. *Id.* at 4-6, 11.  And he alleges that Homeward violated 12 U.S.C. §§ 2605(e)(1) & 2605(e)(2), and HRS § 454 M-6, by "failure to provide information and clarification within 20 days, and . . . failure to provide credits, reimbursements, or refunds and adjustments, within 60 days."  Doc. No. 128, Fourth AC ¶ 72.  The court addresses each theory separately.

### a. 12 U.S.C. § 2605(b)

Plaintiff's claim of a lack of notice under § 2605(b)[12] fails.

---

[12] Section 2605(b) provides in pertinent part:
(1) Notice requirement
Each servicer of any federally related mortgage loan shall notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person.
(2) Time of notice
(A) In general
Except as provided under subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not less than 15 days before the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made).

28

Homeward has produced a letter of June 16, 2008, addressed to Plaintiff with both Option One and Homeward on the letterhead, notifying him of the change in loan servicers.  *See* Doc. No. 246-13, Moving Defs.' Ex. 11.  The notification was made 15 days prior to the effective date, thus complying with § 2605(b)(2).  Citing the June 16, 2008 letter, Homeward's Concise Statement of Facts ("CSF") states that "Option One and Homeward jointly notified Plaintiff that servicing of the loan was being transferred effective July 1, 2008."  Doc. No. 246, Homeward's CSF at 3.  And Plaintiff's responsive CSF (including his Declaration in Opposition to the Motion), Doc. Nos. 283 & 283-1, does not contest that the June 16, 2008 notification letter was sent to him.  It is thus established as fact that Plaintiff was properly notified of the change in his loan servicer.  *See* Local Rule 56.1(g) ("For purposes of a motion for summary judgment, material facts set forth in the moving party's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party.").  Homeward complied with § 2605(b)(2).  Accordingly, Moving Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED as to this claim.

///

///

29

b.   *12 U.S.C. § 2609 and 24 C.F.R. § 3500.17*

Next, Plaintiff's claim under § 2609 and 24 C.F.R. § 3500.17 for

Homeward's alleged failure to provide annual escrow statements also fails.  His

RESPA claim is based on § 2609(c), which requires an annual statement detailing

certain escrow information by "[a]ny servicer that has established or continued an

escrow account in connection with a federally related mortgage loan."  The

corresponding regulations detail "the requirements for an escrow account that a

lender establishes in connection with a federally related mortgage loan."  24 C.F.R.

§ 3500.17(a).[13]

Most importantly, even assuming that the record contains conflicting

evidence as to whether Homeward was required to and/or actually timely provided

---

[13]  The regulations define an "escrow account" as:

> [A]ny account that a servicer establishes or controls on behalf of a
> borrower to pay taxes, insurance premiums (including flood
> insurance), or other charges with respect to a federally related
> mortgage loan, including charges that the borrower and servicer
> have voluntarily agreed that the servicer should collect and pay.
> The definition encompasses any account established for this
> purpose, including a "trust account", "reserve account", "impound
> account", or other term in different localities.  An "escrow
> account" includes any arrangement where the servicer adds a
> portion of the borrower's payments to principal and subsequently
> deducts from principal the disbursements for escrow account
> items.  For purposes of this section, the term "escrow account"
> excludes any account that is under the borrower's total control.

24 C.F.R. § 3500.17(b).

Plaintiff the necessary annual escrow statements, there is no private right of action

under RESPA for a violation of § 2609. *See Hardy v. Regions Mortg. Inc.*, 449

F.3d 1357, 1360 (11th Cir. 2006) (reasoning that there is no private right of action

because "RESPA explicitly states that the Secretary of Housing and Urban

Development enforces violations of § 10 [in 12 U.S.C. § 2609(d)(1)]"); *Louisiana

v. Litton Mortg. Co.*, 50 F.3d 1298, 1301 (5th Cir. 1995) (concluding that there is

no private right of action under Section 2609); *Allison v. Liberty Sav.*, 695 F.2d

1086, 1091 (7th Cir. 1982) (same); *Choudhuri v. Wells Fargo Bank, N.A.*, 2011

WL 5079480, at *8 (N.D. Cal. Oct. 25, 2011); *Benas v. Shea Mortg. Inc.*, 2011 WL

4635645, at *4 (S.D. Cal. Oct. 4, 2011); *Birkholm v. Washington Mut. Bank, F.A.*,

447 F. Supp. 2d 1158, 1163 (W.D. Wash. 2006).[14]

---

[14] In a footnote, the Sixth Circuit in *Vega v. First Federal Saving & Loan Association*, 622 F.2d 918 (6th Cir. 1980) stated:

> As a threshold matter, we must determine whether the Real Estate Settlement Procedures Act creates a private cause of action for violations of 12 U.S.C. § 2609 and 12 U.S.C. § 2610. While the Act does not expressly provide for such a causes of action, we believe, based on the legislative history, that Congress intended to create a private remedy for violations of the Act.

*Id.* at 925 n.8 (citations omitted). The Sixth Circuit, however, stands alone in this view, and "it is unclear whether the holding in footnote 8 of *Vega* still has vitality," because of subsequent amendments. *In re Johnson*, 384 B.R. 763, 773 (Bankr. E.D. Mich. 2008). "At the time the Sixth Circuit issued the *Vega* decision, the statute was limited to the substance of what now appears in § 2609(a), dealing with limits on the amount that a lender may require a borrower to deposit. Subsections 2609(b)-(d) were not added until 1990." *Id.* (internal citations omitted). Indeed, "Congress subsequently added subsection (d), providing specifically for any enforcement action for violations of § 2609(c) to be brought by the Secretary," *id.*, further indicating that there is no private cause of action for violations of § 2609(c), which is the

(continued...)

Nor is there a private right of action under 24 C.F.R. § 3500.17, as that regulation was promulgated under § 2609. *Hardy* so held, reasoning as follows:

> RESPA explicitly states that the Secretary of Housing and Urban Development enforces violations of § 10. 12 U.S.C. § 2609(d)(1). The regulations also provide that "the Secretary shall assess" the penalties. 24 C.F.R. § 3500.17(m)(1). "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."

449 F.3d at 1360 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). *See also, e.g.*, *Gusenkov v. Washington Mut. Bank*, 2010 WL 2612349, at *5 (N.D. Cal. June 24, 2010); *Hilton v. Washington Mut. Bank*, 2010 WL 727247, at *4 (N.D. Cal. Mar. 1, 2010).

Accordingly, Moving Defendants' Motion for Summary Judgment as to 12 U.S.C. § 2609 and 24 C.F.R. § 3500.17 is GRANTED, and Plaintiff's Motion for Summary Judgment is DENIED.

c.      *12 U.S.C. § 2605(e)*

Next, Plaintiff argues that Homeward violated § 2605(e) by failing to respond properly to many of the numerous letters that he sent to Homeward from

_____

[14](...continued)
provision Au contends was violated.

2009 to 2011.[15]  The Fourth AC asserts three types of violations of RESPA under

§ 2605(e):

- A "failure to provide information and clarification within 20 days, and
  . . . failure to provide credits, reimbursements, or refunds and
  adjustments, within 60 days."  Doc. No. 128, Fourth AC ¶ 72;

- A "November 29, 2010" communication requesting an itemization of
  Plaintiff's escrow account for which Plaintiff "received no response"
  and Plaintiff's related "request[s] in writing on December 14, 2010,
  and on March 17, 2011, and on March 29, 2011," after which "Au
  continued to receive letters from Defendant [Homeward] of
  delinquency and threatening foreclosure against Au."  *Id.* ¶ 72A; and

- Other requests for which "Homeward failed to respond," such as (1)
  an April 5, 2011 request for analysis of Plaintiff's escrow account
  "inquiring why Au had been assessed charges for the county real
  property tax of $8,878.20, which Au had earlier paid;" (2) letters of
  January 24, 2011, and on March 1, 2011, seeking "an explanation or
  details;" and (3) an April 25, 2011 letter regarding Plaintiff's
  contention of an overpayment or overcharge of $35,714.00.  *Id.*
  ¶¶ 72B-D.

The court first sets forth applicable RESPA principles, and then

analyzes Plaintiff's proffered violations.

   i.  Legal principles under § 2605(e)

   RESPA provides that "[i]f any servicer of a federally related mortgage

loan receives a qualified written request ['QWR'] from the borrower (or an agent

---

[15]  From these letters, and the numerous responses sent to Plaintiff from Homeward, it is
possible to infer -- although some details are unclear -- the basic servicing history of Plaintiff's
loan.  The court thus reviews pertinent parts of that servicing history as necessary to assess
whether Homeward fulfilled its duties under HRS § 454M-6.

of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days[.]" 12 U.S.C. § 2605(e)(1)(A).[16]  In turn, RESPA defines a QWR as:

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that: (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

*Id.* § 2605(e)(1)(B).  Not later than 60 days after a loan servicer receives a QWR, it must (if the servicer determines an error in the account) make appropriate corrections to the borrower's account and notify the borrower of the correction in writing.  *Id.* § 2605(e)(2)(A).  If a servicer determines that the account is not in error, it must provide the borrower with a written explanation or clarification stating the reasons why the servicer believes the borrower's account is correct.  *Id.*

---

[16]  The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank amendments"), among other changes to RESPA, decreased the response time in § 2605(e)(1)(A) from 20 days to 5 (and from 60 days to 30 days in § 2605(e)(2)).  Although the statutory changes have been codified, they have not yet taken effect. *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 n.3 (10th Cir. 2013) ("On January 17, 2013, the Bureau [of Consumer Financial Protection] issued a final rule implementing the Dodd-Frank amendments to RESPA and amending Regulation X, with an effective date of January 10, 2014.").

§ 2605(e)(2)(B).  And if the QWR pertains to a request for information, the servicer must either provide the information to the borrower or explain why such information is unavailable.  *Id.* § 2605(e)(2)(C).

Both the 20 and 60 day response periods exclude "legal public holidays, Saturdays, and Sundays."  *Id.* §§ 2605(e)(1)(A), (e)(2).  If a servicer fails to respond properly to a valid request, RESPA entitles the borrower to recover "any actual damages to the borrower as a result of the failure" and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance . . . in an amount not to exceed $1,000."  *Id.* § 2605(f)(1)(A) & (B).[17]  Under this section, a plaintiff has the burden to both plead and prove actual damages caused by actionable RESPA violations.  *See, e.g.*, *Menashe v. Bank of N.Y.*, 850 F. Supp. 2d 1120, 1134 (D. Haw. 2012).

Not all written requests from a borrower to a servicer require a response.  Rather, "[u]nder § 2605(e)(1)(A), a servicer must respond to such a letter if it requests or challenges 'information relating to the servicing of such loan.'"  *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665 (9th Cir. 2012) (citing 12 U.S.C. §§ 2605(e)(1)(A), (e)(2)).  And RESPA defines "servicing" as:

---

[17]  The Dodd-Frank amendments increased to $2,000 the potential amount of additional damages for a "pattern or practice" of noncompliance, but that change (although codified), has also not yet taken effect.  *See Berneike*, 708 F.3d at 1145 n.3.

> receiving any scheduled periodic payments from a
> borrower pursuant to the terms of any loan, including
> amounts for escrow accounts described in section 2609
> of this title, and making the payments of principal and
> interest and such other payments with respect to the
> amounts received from the borrower as may be required
> pursuant to the terms of the loan.

12 U.S.C. § 2605(i)(3).  The requirement that a letter must request information

"related to servicing" "ensures that the statutory duty to respond does not arise

with respect to *all* inquiries or complaints from borrowers to servicers." *Medrano*,

704 F.3d at 666.  That is, "servicing:"

> does not include the transactions and circumstances
> surrounding a loan's origination -- facts that would be
> relevant to a challenge to the validity of an underlying
> debt or the terms of a loan agreement.  Such events
> *precede* the servicer's role in receiving the borrower's
> payments and making payments to the borrower's
> creditors. . . .  The statute thus distinguishes between
> letters that relate to borrowers' disputes regarding
> servicing, on the one hand, and those regarding the
> borrower's contractual relationship with the lender, on
> the other.

*Id.* at 666-67.  Accordingly, "letters challenging only a loan's validity or its terms

are not qualified written requests that give rise to a duty to respond under

§ 2605(e)." *Id.* at 667; *see, e.g.*, *Sipe v. Countrywide Bank*, 690 F. Supp. 2d 1141,

1154 (E.D. Cal. 2010) (concluding that a demand for rescission of the loan

agreement does not relate to servicing under § 2605(e) (cited with approval in

*Medrano*, 704 F.3d at 667 n.5)); *Thurman v. Barclays Capital Real Estate Corp.*,

2011 WL 846441, at *4 (E.D. Cal. Mar. 7, 2011) ("A QWR must seek information

relating to the servicing of the loan; a request for loan origination documents is not

a QWR.").

ii.     Application of § 2605(e) principles

With these principles in mind, the court addresses the many letters

that Plaintiff contends implicate § 2605(e).  And as explained to follow, for several

reasons, none of the letters is actionable in this case.  They either (1) require no

response under RESPA; (2) were not mentioned in any version of the Complaint;

(3) were filed after this action was initiated, and/or (4) were properly responded to

by Homeward, whether or not a response was required under RESPA.  And,

finally, Plaintiff has not provided any evidence of damages resulting from any

alleged RESPA violation.[18]

(a)     **February 6, 2009 letter** from Plaintiff directed to both
        Republic and Homeward.  Doc. No. 283-3, Pl.'s Ex. 2.

According to Plaintiff, "[m]y purpose for writing this letter is because

I believe I am entitled to a loan modification in the interest rate and principal that

---

[18]  Some of these letters were not referenced in Plaintiff's initial Motion, Doc. No. 181-1,
and instead were referenced in Moving Defendants' Motion, Doc. No. 245, or in Plaintiff's
Opposition to Moving Defendants' Motion, Doc. No. 283.  Nevertheless, construing the
evidence in the light most favorable to Plaintiff, the court addresses (in some form) each of the
letters from Plaintiff to Homeward that he appears to contend implicate § 2605(e).

you are assessing monthly." *Id.* at 1.  The letter explains Plaintiff's version of the

promised loan terms: "The interest rate on the current loan you are servicing I

believe to be at 8.9% .  The representative of Republic State Mortgage advised me

by telephone that the rate would not exceed 7.5%."  *Id.*  After further details, he

states, "I was never provided a good faith estimate although I requested a copy."

*Id.*  In addition to "demanding a loan modification as to the interest rate and to the

excessive settlement charges," he asks Republic and/or AHSMI to "provide to me

any good faith estimate on the loan prior to closing [and] a copy of the settlement

charges that correspond with the final closing."  *Id.* at 2.

This letter does not ask for servicing information.  It challenges the

loan's terms, asks for a loan modification, and asks for loan documents.  It is thus

not a QWR, and Homeward had no obligation under RESPA to respond.  *See*

*Medrano*, 704 F.3d at 667 ("letters challenging only a loan's validity or its terms

are not qualified written requests that give rise to a duty to respond under

§ 2605(e)."); *Thurman*, 2011 WL 846441, at *4 ("[A] request for loan origination

documents is not a QWR.").

      (b)    **March 3, 2009 letter** from Au to Republic and
                Homeward.  Doc. No. 246-16, Moving Defs.' Ex. 14;
                Doc. No. 283-4, Pl.'s Ex. 3.

This letter, referencing the February 6, 2009 letter, repeats the claim

that "the mortgage rate quoted would not exceed 7.5%, and the total settlement charges would not exceed $15,000." Doc. No. 246-16, Moving Defs.' Ex. 14 at 1. It again requests "a good faith estimate showing the mortgage amount to be 8.9% and total settlement charges of $19,000, which was executed by me prior to and preceding the loan closing." *Id.* at 1-2.

Like the February 6, 2009 letter, this letter is not a QWR. It challenges the loan terms, and asks for loan documents. Homeward had no obligation under RESPA to respond. *Medrano*, 704 F.3d at 667. And, in any event, Homeward responded by letter dated April 6, 2009. *See* Doc. No. 246-17, Moving Defs.' Ex. 15 (setting forth a record of a letter that states "[i]n accordance with your request, enclosed is: A copy of Good Faith Estimate.").[19]

> (c) **April 7, 2009 letter** from Au to Republic and Homeward. Doc. No. 283-5, Pl.'s Ex. 4.

This letter is directed to Republic (although it is also addressed to Homeward) and states in relevant part:

> Dear Ms. McGrath [of Republic]:
>
> I am still waiting for a copy of the good faith estimate executed by me prior to the closing of the loan. . . . I believe I am entitled to the interest rate quoted, and to the

---

[19] Exhibit 15 as supplied to the court, however, does not contain a copy of the good faith estimate.

> excessive closing costs, reimbursed.
>
> On March 26, 2009, you emailed my office advising me that you were still researching this matter.  It has been over ten days, and I have received nothing from Republic State Mortgage or [Homeward].

*Id.* at 1.

As with the February and March 2009 letters, this letter is not a QWR. It continues to challenge the loan terms and ask for a loan document.  Again, it triggered no duty under RESPA.  *Medrano*, 704 F.3d at 667.  And Homeward responded by letter of June 25, 2009 (referring to written correspondence "received . . . on April 7, 2009").  *See* Doc. No. 246-18, Moving Defs.' Ex. 16.  That letter to Plaintiff enclosed copies of the executed note and mortgage, and states (appropriately) that:

> [y]our letter references issues regarding the origination of the loan and suggests that the mortgage loan officer or broker may have engaged in dishonest behavior[.]
>
> Please be advised, [Homeward] is not affiliated with the mortgage lender or broker involved and we played a limited role in the origination of your loan.  Your concerns should be directed to the original mortgage lender, as [Homeward] is only the current servicer of your loan.

*Id.*  The April 7, 2009 letter is not actionable.

       (d)    **May 8, 2009 letter** from Au to Homeward (no copy provided).

Plaintiff provides a letter from Homeward to Plaintiff, dated May 11, 2009, stating in pertinent part:

> Your letter dated 5/8/9 has been received in our office. Thank you for taking the time to put your concerns in writing.
>
> We are currently in the process of researching your concerns and/or request.  A response will be issued when our research is complete.  Generally, responses are issued within 15-20 business days; however, please allow up to 60 days.

Doc. No. 182-6, Pl.'s Ex. D.  The record, however, does not contain a copy of the referenced "5/8/9" letter from Au to Homeward.  There is thus no proof that it was a QWR.  And even assuming such a letter from Au requested servicing information, the May 11, 2009 letter from Homeward fulfilled the requirement under § 2605(e)(1)(A) to respond within 20 days.  And Plaintiff has presented no evidence that any other response regarding a May 8, 2009 letter to Homeward was insufficient.  Plaintiff has not met his burden to create a question of fact as to a RESPA violation here.

       (e)    **June 29, 2009 letter** from Au to Homeward.  Doc. No. 283-8, Pl.'s Ex. 7.

By letter of May 29, 2009, Homeward informed Plaintiff that tax

records indicated he had not paid his property taxes on the subject property, and

requested that Plaintiff pay the taxes or provide proof that he had paid them.

(Homeward apparently did not normally collect payments for taxes or insurance

from Plaintiff, but rather, he was responsible for such payments directly. *See, e.g.*,

Doc. No. 275-1, Ellis Decl. ¶ 4 ("The Loan was a non-escrowed loan.

Accordingly, the borrowers were responsible for providing proof of insurance to

the lender under paragraph 5 of the Mortgage.")).[20]  Specifically, Homeward

informed Plaintiff

> Real estate taxes and/or assessments on your property
> have not been paid.  Under the terms of your Mortgage or
> Deed of Trust, it is your responsibility to pay the taxes or
> charges in a timely manner and provide proof of
> payment.
>
> If you have paid the taxes, please mail proof of payment
> to our office. . . .  If you have not paid the taxes, please
> do so immediately. . . .
>
> If [Homeward] does not receive evidence of tax payment
> within 30 days of the date of this letter, we may pay the
> delinquent amounts to protect our interest in the property
> and increase your monthly payment to collect these

---

[20]  Given this uncontested statement, Homeward argues that it had no duty at all to provide annual escrow statements prior to 2010, when it established an escrow account to pay for lender-placed insurance on the subject property.  Doc. No. 274, Moving Defs.' Opp'n at 5 n.4. The court need not resolve here whether Homeward had such a duty under RESPA earlier than 2010 because, as analyzed above, there is no private cause of action for violations of § 2609 or 24 C.F.R. § 3500.17.  This assertion, however, becomes relevant in analyzing the claim under HRS Ch. 454M.

42

> funds.  Additionally, an impound account may be established for future tax payments.

Doc. No. 283-7, Pl.'s Ex. 6.

Thus, Plaintiff wrote on June 29, 2009 to Homeward:  "I am enclosing payment in full for real property taxes paid to the City & County of Honolulu[.]" Doc. No. 283-8, Pl.'s Ex. 7.  The letter simply states "I trust you will find this satisfactory," and attaches a copy of a $8,878.20 check payable to the City and County of Honolulu dated March 30, 2009 for Plaintiff's real property taxes.  *Id.* at 2.

Although arguably this June 29, 2009 letter pertains to "servicing," it does not request any information from Homeward, and, indeed, does not ask for a response at all.  It does not indicate that the account is in error.  It simply submits proof of payment.  It was thus not a QWR that required a specific response from Homeward under RESPA.  (There is no other reference in the record to unpaid taxes, nor any indication that Homeward established an impound account or paid property taxes on Plaintiff's behalf.)  In short, this letter does not implicate § 2605(e).

> (f)   **July 8, 2009 letter** from Au to Republic and Homeward. Doc. No. 182-4, Pl.'s Ex. B.

This letter (which, as submitted to the court, is unsigned) from

Plaintiff to Republic and Homeward, refers to the February 6, 2009 and March 3, 2009 letters described above.  Similar to those letters, it again complains that the rate on Plaintiff's loan has not been corrected from 8.9% to 7.5%, and states that an attorney for Republic has assured him Republic would provide a "good faith estimate commitment signed by me for 8.9% and settlement charges of $19,000 prior to closing."  *Id.*  It concludes that the letter "formally advises your company that if the rate is not adjusted immediately to reflect a 7.5% simple interest loan . . . that I will be initiating a lawsuit against Republic State Mortgage Co. for fraud, non-disclosure and misrepresentation."  *Id.* at 2.

Homeward appears to have responded within 20 business days.  Although not clearly responsive to this particular letter, the record contains three letters from Homeward to Plaintiff that responded to this or similar letters:  (1) a July 21, 2009 letter referring to "your letter dated 07/20/09," stating in part "[w]e are currently in the process of researching your concerns," Doc. No. 182-7, Pl.'s Ex. E; (2) a July 23, 2009 letter from Homeward to Plaintiff referring to "your letter dated 07/22/09," also stating in part "[w]e are currently in the process of researching your concerns,"  Doc. No. 182-8, Pl.'s Ex. F; and (3) an August 4, 2009 letter stating "[p]ursuant to your request we have attached hereto collectively a copy of the following documents incorporated by reference herein[:] Good Faith

44

Estimate Statements." Doc. No. 246-28, Moving Defs.' Ex. 26.

More importantly, this July 8, 2009 letter is not a QWR. Like the February, March, and April 2009 letters, it continues to challenge the loan terms and ask for a loan document. It thus triggered no duty under § 2605(e).

       (g)  **August 4, 2009 letter** from Au to Republic and Homeward. Doc. No. 182-5, Pl.'s Ex. C (unsigned copy).

On August 4, 2009, Plaintiff wrote yet another letter (referencing his letter of July 8, 2009) to Republic and Homeward, again stating that "as of this date I have never received the good faith estimate signed by myself as borrower, agreeing to an interest rate of 8.9% and $19,000 in settlement charges." *Id.* at 2. He acknowledges that Homeward has responded to the July 8, 2009 letter, stating "[t]he only response I have received thus far is from [Homeward] which claims they have no responsibility for misrepresentations made by [Republic]." *Id.* at 1. And again, he seeks a lower interest rate loan: "[t]o date no affirmative conduct by [Republic] or [Homeward] has reduced the interest rate or refunded the excess closing costs." *Id.* Plaintiff stated that "[t]his letter is to formally advise [Republic] and [Homeward]  that if I do not receive the good faith estimate requested by me within 10 days . . . a lawsuit will be commenced in the State of Hawaii." *Id.* at 2.

Like the letters from February, March, April, and July 2009, this letter

challenges the loan terms and asks for loan documentation.  Like those letters, this

letter is not a QWR.  And like those letters, Homeward responded in a timely

fashion to Plaintiff's various requests.  *See* Doc. No. 246-28, Moving Defs.' Ex. 26

(August 4, 2009 letter from Homeward stating "[p]ursuant to your request we have

attached hereto collectively a copy of the following documents incorporated by

reference herein[:] Good Faith Estimate Statements"); Doc. No. 246-19, Moving

Defs.' Ex. 17 (September 3, 2009 letter from Homeward to Au stating "[p]lease be

advised, [Homeward] is not affiliated with the mortgage lender or mortgage broker

involved and we played no role in the origination of your loan.  Your concerns

should be directed to the original mortgage lender[.] . . .  Although we are unable

to adjust the interest rate on your loan, [Homeward] offers a variety of work out

options including, but not limited to, Loan Modifications, Repayment Plans, Deed-

in-Lieu of Foreclosures, and Short Sales.").  Accordingly, this letter is not

actionable under § 2605(e).

> (h)   **September 13, 2010 letter** from Au to Republic and
>        Homeward.  Doc. No. 182-9, Pl.'s Ex. G.

On September 13, 2010, Plaintiff followed the August 4, 2009 letter

with another letter (again "enclosing a letter written to you on July 8, 2009")

stating that "[a]s of today, I have received no good faith estimate from Republic

State Mortgage or their loan broker establishing that I agreed to an 8.9% rate and

$19,000 in settlement charges. . . .  This letter is a formal demand that if I do not

receive the good faith estimate establishing a loan at 8.9% and $19,000 in

settlement charges that I will be commencing a lawsuit in the State of Hawaii

against Republic State Mortgage, and the servicing company, American Home

Mortgage."  *Id.* at 1-2.

Homeward responded by letter dated September 22, 2010, stating that

"[w]e are currently in the process of researching your concerns."  Doc. No. 182-11.

Pl.'s Ex. I.  And, on September 28, 2009, it sent another response to Au, enclosing

a copy of its September 3, 2009 letter.  Doc. No. 246-20, Moving Defs.' Ex. 18.

Moreover, as with the August 2010 letter from Plaintiff to Homeward, this letter is

also not a QWR -- it challenges loan terms and requests loan documents.

> (i)   Letters related to hurricane insurance in 2010 -- An
> **August 19, 2010 letter** from Au to Homeward, Doc. No.
> 283-9, Pl.'s Ex. 8 (unsigned copy); and an **Oct. 19, 2010**
> **letter** from Au to Homeward.  Doc. No. 283-10, Pl.'s Ex.
> 9 (unsigned copy).

Under the terms of this loan agreement, it is Plaintiff's responsibility

to provide proof of insurance coverage for the subject property.  *See, e.g.*, Doc. No.

246-24, Moving Defs.' Ex. 22.  Plaintiff apparently did not provide such proof to

Homeward in April 2010.  Thus, Homeward secured "lender-placed" insurance

coverage, advanced payment of $7,568.60, established an escrow account, and

increased Plaintiff's monthly payments accordingly.  *Id.*  Apparently in response to

this, Plaintiff wrote an August 19, 2010 letter to Homeward, stating:

> Hurricane insurance has been purchased for the above
> property through Zephyr Insurance in Hawaii.  They
> advised me that they have sent you the reinstatement of
> the policy.  Please do not purchase an insurance policy
> for this property since it is fully covered with fire,
> general liability and hurricane insurance.  Please write to
> me directly on this.

Doc. No. 283-9, Pl.'s Ex. 8.  The record does not indicate whether Homeward

responded to this letter within 20 business days, but (assuming it was a QWR),

Plaintiff has no evidence of any actual damages resulting from a failure to respond

within that period.  *See, e.g.*, *Menashe*, 850 F. supp. 2d at 1134 (setting forth

requirement of pleading and proving actual damages to establish a violation of

§ 2605).[21]

He followed this letter with a letter to Homeward's "Insurance Dept."

of October 19, 2010, stating,

I enclose a copy of the Hurricane insurance policy for 45-

---

[21]  Indeed, as described next, Homeward did in fact adjust its escrow account and then
credited Plaintiff for the cost, resulting in a balance of over $6,600 in the account.  *See* Doc. No.
246-22, Moving Defs.' Ex. 20.

> 030 Springer Place.  Please remove the hurricane policy
> immediately from your escrow account.  Please adjust
> your escrow statement immediately and credit back any
> payments that may have been made on the hurricane
> policy.  May I hear from you immediately[?]

Doc. No. 283-10, Pl.'s Ex. 9 (unsigned copy).  Although it is unclear what

documents were enclosed in that letter, Plaintiff has supplied the court with

insurance declaration pages covering a period from April 25, 2010 to April 25,

2011 indicating that there indeed was fire and hurricane insurance coverage for the

subject property.  *See* Doc. No. 283-19, Pl.'s Ex. 18 (fire); Doc. No. 283-20, Pl.'s

Ex. 19 (hurricane).

Assuming this October 19, 2010 letter was a QWR (as it was related

to servicing and requested information), however, Homeward quickly responded

by letter of November 2, 2010.  *See* Doc. No. 246-22, Moving Defs.' Ex. 20.  That

letter to Plaintiff states,

> [a]s requested, we have removed the escrow account for
> wind insurance. . . .  We trust that you understand the
> importance of paying tax and insurance bills in a timely
> manner.  Please be advised that we do retain the legal
> right to re-establish your escrow account if we become
> aware that your tax or insurance obligations are not being
> paid on time.

*Id.*  Plaintiff may have then written another letter dated December 23, 2010 to

Homeward regarding insurance because -- although the record does not contain a

copy of a December 23, 2010 letter -- Homeward wrote to Plaintiff on December 28, 2010 stating that it was "in receipt of your correspondence dated 12/23/2010," and that "[a] response will be issued when our research is complete. Generally, responses are issued within 15-20 business days; however, please allow up to 60 business days." Doc. No. 246-23, Moving Defs.' Ex. 21.

Having completed its investigation, by letter of February 9, 2011 (within 60 business days of December 23, 2010), Homeward wrote to Plaintiff and gave a detailed explanation of what had occurred regarding the lender-placed insurance. *See* Doc. No. 246-24, Moving Defs.' Ex. 22. As explained by Homeward, it had not received notice of insurance in April 2010, but after it had received proof of insurance from Plaintiff, it refunded the $7,568.60 paid for the lender-placed insurance and applied that amount to Plaintiff's escrow account (and then was to "delete" the escrow account for such insurance). *Id.* at 2. This resulted in an overage of $6,601.66, which would be refunded to Plaintiff after the next escrow analysis, which was to occur in 30 days. Homeward also "corrected the derogatory credit information reported for the month[s] of September 2010 through January 2011." *Id.* Homeward then reminded Plaintiff that his account "is currently due for the January 1, 2011 payment and subsequent payment in the amount of $11,189.24, with the outstanding late charges of $2,349.76." *Id.*

50

Given that history regarding the 2010 insurance, Homeward fulfilled any duties it had under RESPA to respond to Plaintiff's written requests regarding servicing.  It responded and corrected any errors within a 60-day period under § 2605(e)(2)(A).  There is thus no RESPA violation here.

(j)     Letters regarding Plaintiff's payment history.

On November 22, 2010, Homeward wrote to Plaintiff, informing him that his loan was delinquent.  Homeward told Plaintiff, among other matters, that:

> Your immediate response is required.  Your mortgage payment is now more than twenty days delinquent. Should the loan become 31 days delinquent, in accordance with applicable state and federal law, a Notice of Intent to Foreclose may be issued. . . . If you have overlooked this month's payment, please remit the payment immediately along with the late charge.

Doc. No. 182-12, Pl.'s Ex J.  Plaintiff responded with several letters to Homeward, challenging that his account was delinquent, and requesting "a complete summary of all payments, to include credits and charges, from January 1, 2010[.]"  Doc. No. 182-13, Pl.'s Ex. K.  These letters,[22] all requesting similar information, are:

---

[22]  Plaintiff also cites a January 24, 2011 letter from him to "G. Moss & Associates" regarding his account.  *See* Doc. No. 182-15, Pl.'s Ex. M.  "G. Moss & Associates" apparently was a law firm involved in collection matters for Homeward.  *See, e.g.*, Doc. No. 246-34, Moving Defs.' Ex. 32.  Because this letter was not sent to Homeward, it did not require a response.

- A **Nov. 29, 2010 letter** from Au to Homeward. *Id.* ("All payments . . . have been kept current through the end of November 30, 2010. . . . I am requesting . . . a complete summary of all payments[.]");

- A **Dec. 14, 2010 letter** from Au to Homeward. Doc. No. 182-14, Pl.'s Ex. L ("On December 13, 2010, I paid by telephone $5594.62, and was advised that this was November's and not December's payment. I again request [a summary of payments] from January 1, 2010.");

- A **March 1, 2011 letter** from Au to Homeward. Doc. No. 182-16, Pl.'s Ex. N ("I am extremely disturbed because I received threatening calls and letters each month that the account is more than sixty days delinquent . . .   I request a complete breakdown of all payments made since January, 2010, through the end of January, 2011, to include interest charges, late payment charges, escrow charges, and any credits or debits against the account[.]"); and

- A **March 17, 2011 letter** from Au to Homeward. Doc. No. 182-17, Pl.'s Ex. O ("I am still waiting for an update on all payments that have been made on this mortgage from June, 2009 through January, 2011. I would like to see any and all late charges and any payments made for premiums where [Homeward] purchased an insurance policy as well as any credits after the company received notice that the property has always been insured. I have not received the Federal tax information to show mortgage interest and tax paid for the year 2010.").

The record is unclear as to whether Homeward responded within 20 days to the November 29, 2010 and December 14, 2010 letters. Moving Defendants argue that the letter of December 28, 2010 from Homeward to Plaintiff was responsive. *See* Doc. No. 246-23, Moving Defs.' Ex. 21. That letter states that Homeward is researching Plaintiff's concerns, but it refers to Plaintiff's

"correspondence dated 12/23/2010" -- not to a November 29, 2010 or December 14, 2010 letter.  In this regard, the court must construe the record in Plaintiff's favor and assume that Homeward did not acknowledge receipt of those letters within 20 business days.  But even if this is a violation, however, Plaintiff has presented no evidence of damages resulting from a failure to acknowledge these particular letters within 20 business days.  *See, e.g.*, *Menashe*, 850 F. Supp. 2d at 1134.

Nevertheless, on February 4, 2011 (within 60 business days of either letter), Homeward wrote to Plaintiff "in reference to the correspondence received by [Homeward]" and his "recent inquiry regarding a credit correction" and concluded that "[a]fter reviewing all pertinent information, [Homeward] has sent notice to the credit bureaus confirming" that his loan was current from September 2010 to January 2011.  Doc. No. 246-25, Moving Defs.' Ex. 23; Doc. No. 283-2, Pl.'s Ex. 1.  Essentially, Homeward corrected any error it made in asserting that the loan was delinquent.[23]  And, on February 9, 2011 (also within 60 business days of either letter), Homeward wrote another letter to Plaintiff explaining the insurance

---

[23] Plaintiff has not argued, and has not provided any evidence, that he should not have been assessed late fees.  And the record clearly indicates that Plaintiff was late in making payments on numerous occasions, incurring late fees, and indeed appears to support Homeward's prior assertions -- despite Homeward's February 4, 2011 letter -- that Plaintiff was delinquent at least some times.  *See* Doc. No. 246-14, Moving Defs.' Ex. 12; Doc. No. 283-15, Pl.'s Ex. 14.

issue and providing a copy of the loan's payment history.  It thus responded with the information Plaintiff requested, and did so within the time period required under RESPA.

As for the March 1, 2011 and March 17, 2011 letters from Plaintiff, again requesting loan information (payment history and tax information), Homeward appears to have responded by acknowledging receipt within 20 business days to both letters.  *See* Doc. No. 246-29, Moving Defs.' Ex. 27 (March 9, 2011 letter from Homeward to Plaintiff stating '[a] response will be issued when our research is complete"); Doc. No. 246-30, Moving Defs.' Ex. 28 (March 31, 2011 letter).  And on April 27, 2011 (within 60 days of either March 2011 letter), Homeward provided another copy of Plaintiff's payment history and indicated that his 2010 Mortgage Interest Statement had been mailed (both on December 31, 2009, and on April 6, 2011).  Doc. No. 246-32, Moving Defs.' Ex. 30.  Further, on May 3, 2011, Homeward wrote another letter to Plaintiff that, among other matters, enclosed (again) his payment history from January 1, 2010 to May 2, 2011.  Doc. No. 246-34, Moving Defs.' Ex. 32.

Thus, Homeward has demonstrated that it complied with RESPA requirements under § 2605(e).  And, again, even if there is some question as to whether Plaintiff received these responses from Homeward in a timely manner,

Plaintiff has not provided any evidence of damages from a failure on Homeward's part to acknowledge these particular letters within 20 days.  *See, e.g.*, *Menashe*, 850 F. Supp. 2d at 1134.

(k)    Post March 24, 2011 letters.

Plaintiff next cites several letters written after the First Amended Complaint ("FAC") was filed and removed to this court.[24]  These letters reflect that Homeward continued efforts (after suit was filed), directly or through counsel, to have Plaintiff meet his loan obligations -- and Plaintiff continued to write similar letters to Homeward protesting such efforts or repeating his requests for information from Homeward.  (Again, Plaintiff's last loan payment was for January 2011, before suit was filed.)

All of the post-March 24, 2011 letters to Homeward, however, are not actionable in this suit -- they post-date the filing of the FAC, and Plaintiff did not have permission under Federal Rule of Civil Procedure 15(d) to incorporate post-filing events in this suit.[25]  As to Homeward, the March 24, 2011 FAC alleged (in a

---

[24]  As explained in Section II.B., the Complaint was filed on March 15, 2011, and Plaintiff then quickly amended it on March 24, 2011, before the Complaint was served.  Doc. No. 1-2, Notice of Removal Ex. B.  The action was then removed on April 14, 2011.  Doc. No. 1.

[25]  Regarding supplemental pleadings, Federal Rule of Civil Procedure 15(d) provides:

<blockquote>On motion and reasonable notice, the court may, on just terms,</blockquote>

(continued...)

count for misrepresentation and fraud) that Homeward:

> [F]ail[ed] to provide itemized statements of mortgage, interest and assessment payments made by Plaintiff Au.
>
> [A]ssess[ed] unlawful charges against Plaintiff Au to include insurance premiums, county real estate taxes, delinquent charges, fail[ed] to promptly credit Plaintiff Au with monthly payments received, fail[ed] to provide customer service telephone numbers which do not provide access to a live operator or other reasonable assistance in the United States, fail[ed] to itemize arrearages and assessment amounts, fail[ed] to provide past payments to Plaintiff to establish arrearages and assessments, itemized late charges.
> . . . .
> [F]ailed [to] provide information that [Sand Canyon] [was] actually the mortgage and promissory note holder[.]

Doc. No. 1-1, FAC ¶¶ 20A-D.  The court later granted Plaintiff leave to amend to allege these allegations in a RESPA claim.  Doc. No. 81, Order at 2.  And *Au II* then (again) granted Plaintiff leave to amend to separate those original RESPA-based allegations into a separate count.  *Au II*, 2012 WL 760316, at *2.

Although *Au III* allowed Plaintiff's RESPA claim to stand, it did not address

---

[25](...continued)
> permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.  The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

whether any allegations of events after the filing of the FAC were improperly

added to the Fourth AC.  In short, Plaintiff never sought, and was never granted,

permission to add "any transaction, occurrence, or event that happened after the

date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).  As is otherwise

the case, the suit is thus limited to events occurring prior to filing of suit.

Accordingly, the following letters (which, by and large, continue the prior pattern

of Plaintiff requesting payment information that Homeward had already provided)

from Plaintiff to Homeward are not actionable in this suit:[26]

- A **March 29, 2011 letter** from Plaintiff to Homeward.  Doc. No. 182-18, Pl.'s Ex. P; Doc. No. 283-13, Pl.'s Ex. 12.

- An **April 25, 2011 letter** from Plaintiff to Homeward.  Doc. No. 182-20, Pl.'s Ex. R.

- An **April 26, 2011 letter** from Plaintiff to Homeward.  Doc. No. 182-21, Pl.'s Ex. S; Doc. No. 283-16, Pl.'s Ex. 15.

- A **May 6, 2011 letter** from Plaintiff to Homeward.  Doc. No. 182-23, Pl.'s Ex. U; Doc. No. 283-18, Pl.'s Ex. 17.

- A **June 3, 2011 letter** from Plaintiff to Homeward.  Doc. No. 182-24, Pl.'s Ex. V.

- A **June 16, 2011 letter** from Plaintiff to Homeward.  Doc. No. 283-11, Pl.'s Ex. 10.

---

[26]  Even if the letters were part of this action, to the extent any are QWRs, Homeward appears to have properly responded to them.  *See* Doc. Nos. 246-30 to 246-34, Moving Defs.' Exs. 28 to 34.

- A **Sept. 14, 2011 letter** from Plaintiff to Homeward.  Doc. On. 182-25, Pl.'s Ex. W.

## 2.    *Count Nine (HRS § 454M-6)*

Next, Plaintiff asserts Homeward violated HRS Ch. 454M

(specifically HRS § 454M-6) in its role as servicer for Plaintiff's loan.  Effective

July 1, 2010, § 454M-6 provides:[27]

> It shall be unlawful for any mortgage servicer in the course of any mortgage loan transaction:
>
> (1)  To misrepresent or conceal material facts, to make false promises, or to pursue a course of misrepresentation through its agents or otherwise;
>
> (2)  To engage in any transaction, practice, or course of business that is not in good faith, does not constitute fair dealing, or that constitutes a fraud upon any person, in connection with the servicing, purchase, or sale of any mortgage loan;
>
> (3)  To fail to comply with the mortgage loan servicing transfer, escrow account administration, or borrower inquiry response requirements imposed by sections 6 and 10 of the Real Estate Settlement Procedures Act, 12 United States Code sections 2605

---

[27]  Section 454M-6 was amended in 2012 (effective on July 6, 2012) to make stylistic changes.  The court applies the prior version of the statute in this case.  *See* Act 245, 2012 Haw. Sess. L. § 6 ("This Act does not affect rights and duties that matured, penalties that were incurred, and proceedings that were begun before its effective date.").

and 2609, and regulations adopted
thereunder by the Secretary of Housing and
Urban Development; or

(4)  To fail to comply with applicable
federal laws and regulations related to
mortgage servicing.

Initially, because *Au III* previously dismissed Counts Three

(misrepresentation) and Seven (fraud/nondisclosure) against Homeward, there is

no basis for a similar claim for misrepresentation or concealment under § 454M-

6(1) (misrepresentation/concealment).  Further, as demonstrated by the court's

review and analysis of Homeward's various responses to the numerous letters from

Plaintiff to Homeward, there is no possible basis for a claim that Homeward

engaged in any practice that "is not in good faith, does not constitute fair dealing,

or that constitutes a fraud upon any person, in connection with the servicing,

purchase, or sale of any mortgage loan" under § 454M-6(2).  And, likewise,

because the court has granted summary judgment in favor of Homeward for claims

under 12 U.S.C. § 2605, there is no basis for liability under § 454M-6(3) or

§ 454M-6(4) for a violation of that section of RESPA.

The court recognizes that § 454M-6(3) also provides for a private

cause of action under state law for a violation of 12 U.S.C. § 2609 and/or 24 C.F.R.

§ 3500.17 (where, as analyzed above in section IV.B.1.b, the court granted

summary judgment in favor of Homeward because RESPA itself does *not* allow

private enforcement of § 2609 and/or § 3500.17).  Assuming § 454M-6(3) is not

preempted (a question neither raised or briefed), the court briefly addresses

whether Plaintiff may proceed past this summary judgment stage on a claim under

§ 454M-6(3) based on Homeward's alleged violations of § 2609 and/or § 3500.17

-- mindful that § 454M-6 only potentially applies to Homeward's actions or

omissions occurring after § 454M-6's effective date of July 1, 2010.

       In this regard, Plaintiff's claim is based on allegations that Homeward

failed to compile and/or provide annual escrow account statements after he

repeatedly asked for them.  Homeward provides evidence, however, that "[t]he

loan was a non-escrowed loan."  Doc. No. 275-1, Ellis Decl. ¶ 4.  That is, Plaintiff

was responsible for securing his own hazard insurance on the subject property and

for paying property taxes -- outside of an escrow account.  *Id.*  Plaintiff has not

challenged that "the loan was a non-escrowed loan," and the evidence of the loan

servicing history supports Homeward's assertion -- Plaintiff paid his real property

taxes and hazard insurance directly.  *See, e.g.*, Doc. No. 283-8, Pl.'s Ex. 7; Doc.

No. 246-24, Moving Defs.' Ex. 22.

       And in 2010, when Homeward secured lender-placed insurance on

Plaintiff's behalf (after not having received proof of insurance), Homeward

established an escrow account to arrange for payment, Doc. No. 246-24, Moving Defs.' Ex. 22, and subsequently closed the escrow account at Plaintiff's direction. *Id.*; *see also* Doc. No. 246-20, Moving Defs.' Ex. 20 ("As requested, we have removed the escrow account for wind insurance[.]").  Most importantly, Homeward created and provided Plaintiff with an annual escrow statement -- in accordance with § 2609 and/or § 3500.17 -- for 2010, the year it actually conducted escrow activity.  *See* Doc. No. 246-26, Moving Defs.' Ex. 24.

In short, for 2010 -- the only year in question given § 454M's effective date -- Homeward complied with RESPA, and thus there is no basis for a claim under § 454M-6(3).[28]

### 3.     *Count Ten (HRS § 480-2)*

Lastly, the court addresses Plaintiff's claim under HRS § 480-2.  To review, *Au III* allowed non-preempted § 480-2 claims to proceed against Homeward (in part) based on general allegations that Homeward:

> fail[ed] to provide escrow and accounting information on
> the many written inquiries by Plaintiff Au . . .

---

[28] In his Opposition, Plaintiff also cites to HRS § 454M-5, which (like § 454M-6) is also effective July 1, 2010.  Doc. No. 281, Pl.'s Opp'n at 4.  Section 454M-5 provides in pertinent part that a mortgage servicer shall "(1) Safeguard and account for any money handled for the borrower; [and] (2) Act with reasonable skill, care, timeliness, promptness, and diligence[.]"  *Id.* § 454M-5(a).  This section, however, was not specifically plead in Count Nine of the Fourth AC, and is not properly before the court.  In any event, given the other rulings in this Order (e.g., no violations of RESPA), there is likewise no basis for a violation of § 454M-5.

> overcharg[ed] for fire, hazard, hurricane insurance
> premiums, City and County real estate taxes; assess[ed]
> delinquent charges, fail[ed] to promptly credit Plaintiff
> Au upon receipt of monthly payments; fail[ed] to provide
> Plaintiff Au access to a customer telephone service in the
> United States requiring Plaintiff to call India to obtain
> information on Plaintiff Au's escrow account; [and]
> fail[ed] to provide an annual detailed and complete
> escrow account statement.

Doc. No. 128, Fourth AC ¶ 80; *see Au III*, 2012 WL 3113147, at *8 .  Now, to

withstand Moving Defendant's Motion for Summary Judgment, Plaintiff has the

burden of providing *evidence* to support his claim.  HRS § 480-2 requires proof of

(1) an unfair or deceptive trade practice, (2) injury to the plaintiff's business or

property resulting from that practice, and (3) actual damages.  *See, e.g.*, *Haw. Med.

Ass'n v. Haw. Med. Serv. Ass'n, Inc.*, 113 Haw. 77, 113-14, 148 P.3d 1179, 1215-

16 (2006).

But, as explained in ruling on other claims alleged against Homeward

in this Order, the evidence establishes that Homeward responded in a timely

manner to almost every one of Plaintiff's numerous written requests for

information (whether or not responses were required under RESPA) for the

relevant time periods (prior to the filing of the FAC on March 24, 2011).  When

given the opportunity, Homeward investigated Plaintiff's claims regarding hazard

insurance, refunded the premium it charged for lender-placed insurance, and

credited his escrow account over $6,600.  Doc. No. 246-24, Moving Defs.' Ex. 22.

Homeward investigated Plaintiff's claims that his loan was current in 2010, and

issued a letter in January 2011 informing the credit bureaus that this account was

current for September 2010 to January 2011.  Doc. No. 245-25, Moving Defs.' Ex.

23.

There is thus no basis for any unfair or deceptive act or practice

against Homeward.  And, even assuming a question of fact exists as to whether any

acts of Homeward were misleading or deceptive, Plaintiff has no evidence of actual

damages resulting from any such act.  Accordingly, there being no genuine issue of

material fact, Homeward is entitled to summary judgment in its favor on Count

Ten.  *See Haw. Med. Ass'n*, 113 Haw. at 113-14, 148 P.3d at 1215-16.[29]

## C.    A Final Judgment Under Rule 54(b) is Inappropriate

Moving Defendants, having obtained summary judgment in their

favor on all remaining claims, also seek certification of a final judgment under

Federal Rule of Civil Procedure 54(b).  Rule 54(b) regarding "Judgment on

Multiple Claims or Involving Multiple Parties" provides:

---

[29]  Plaintiff's Counter-Motion against Wells Fargo, Doc. No. 282, is largely based on a theory that Wells Fargo could be held jointly or severally liable for any violations of Homeward as its agent.  But because there are no remaining claims against Homeward, Plaintiff's Counter-Motion necessarily fails.  The Counter-Motion is DENIED.

When an action presents more than one claim for relief --
whether as a claim, counterclaim, crossclaim, or
third-party claim -- or when multiple parties are involved,
the court may direct entry of a final judgment as to one or
more, but fewer than all, claims or parties only if the
court expressly determines that there is no just reason for
delay. Otherwise, any order or other decision, however
designated, that adjudicates fewer than all the claims or
the rights and liabilities of fewer than all the parties does
not end the action as to any of the claims or parties and
may be revised at any time before the entry of a judgment
adjudicating all the claims and all the parties' rights and
liabilities.

As stated by the Ninth Circuit, a district court may direct entry of final

judgment as to one party in a multi-party suit as follows:

A district court must first determine that it has rendered a
"final judgment," that is, a judgment that is "'an ultimate
disposition of an individual claim entered in the course of
a multiple claims action.'" *Curtiss-Wright* [*Corp. v. Gen.
Elec. Co.*, 446 U.S. 1, 7 (1980)] (quoting [*Sears, Roebuck
& Co. v. Mackey*, 351 U.S. 427, 436 (1956)]). Then it
must determine whether there is any just reason for delay.
"It is left to the sound judicial discretion of the district
court to determine the 'appropriate time' when each final
decision in a multiple claims action is ready for appeal.
This discretion is to be exercised 'in the interest of sound
judicial administration.'" *Id.* at 8, 100 S. Ct. 1460
(quoting *Mackey*, 351 U.S. at 437, 76 S. Ct. 895).
Whether a final decision on a claim is ready for appeal is
a different inquiry from the equities involved, for
consideration of judicial administrative interests "is
necessary to assure that application of the Rule
effectively 'preserves the historic federal policy against
piecemeal appeals.'" *Id.* (quoting *Mackey*, 351 U.S. at

438, 76 S. Ct. 895).

*Wood v. GCC Bend, LLC*, 422 F.3d 873, 878 (9th Cir. 2005).  The court should

"consider such factors as whether the claims under review were separable from the

others remaining to be adjudicated and whether the nature of the claims already

determined was such that no appellate court would have to decide the same issues

more than once even if there were subsequent appeals."  *Curtiss-Wright*, 446 U.S.

at 8.  *See also Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 797 (9th Cir. 1991) (stating

that certification under Rule 54(b) "is proper if it will aid 'expeditious decision' of

the case" (quoting *Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 468 (9th Cir.

1987))).

Here, although the court has now adjudicated all remaining claims

against both Wells Fargo and Homeward, the court declines to certify the decision

against them as final under Rule 54(b).  This case involves numerous claims

against numerous Defendants.  It is complicated -- factually, procedurally, and

substantively.  It involves both federal and state law.  It is thus readily apparent

that the claims against Wells Fargo and Homeward are not separable from the

remaining claims against Republic and Cotton (and from the already decided

claims against Sand Canyon) "such that no appellate court would have to decide

the same issues more than once even if there were subsequent appeals."

*Curtiss-Wright*, 446 U.S. at 8.  If the court were to certify the action as final as to Wells Fargo and Homeward, Plaintiff could then appeal this Order while proceedings continue as to other Defendants.  The Ninth Circuit would likely agree that this is not a case suitable for piecemeal appeals.  Applying the *Mackey* factors, it is simply inappropriate, at this stage, for a Rule 54(b) partial judgment to Moving Defendants (or any other party).

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Renewed Motions for Partial Summary Judgment are DENIED.  *See* Doc. No. 240 (incorporating Doc. Nos. 175 & 181).  Moving Defendants' Motion for Summary Judgment, Doc. No. 245, is GRANTED, and Plaintiff's Cross-Motion for Summary Judgment against Wells Fargo, Doc. No. 282, is DENIED.  Finally, although there are no claims remaining against Wells Fargo and Homeward, the court DENIES their request to certify a judgment against as final under Rule 54(b).  The only claims remaining in the

///

///

///

///

///

action are Counts One, Two, and Three as to Republic (with the status of Cotton still uncertain).  *See Au V*, 2013 WL 1339738, at *14.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii:  May 31, 2013.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Au v. Republic State Mortg. Co.*, Civ. No. 11-00251 JMS-KSC, Order (1) Denying Plaintiff's Renewed Motions for Partial Summary Judgment; (2) Granting Defendants Homeward Residential and Wells Fargo Bank's Motion for Summary Judgment; (3) Denying Plaintiff's Cross-motion for Summary Judgment Against Defendant Wells Fargo Bank; and (4) Denying Request for Rule 54(b) Certification